UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLEEN JAEGER, et al., | Case No. 15-cv-00164-HSG |
| Plaintiffs, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND THE COMPLAINT** |
| HOWMEDICA OSTEONICS CORP., | Re: Dkt. No. 62 |
| Defendant. | |

Before the Court is Defendant Howmedica Osteonics Corp.'s ("Defendant") motion to dismiss Plaintiffs Colleen Jaeger and William Jaeger's ("Plaintiffs") first amended complaint, Dkt. No. 59 ("Am. Compl."), under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted and Federal Rule of Civil Procedure 9(b) for failure to plead allegations of fraud with particularity. Dkt. No. 62 ("Mot."). Plaintiffs assert a variety of tort and contract causes of action under California law relating to Defendant's allegedly faulty medical device that was implanted in Ms. Jaeger's spine. Defendant contends that certain of Plaintiffs' causes of action are variously time-barred, subject to pharmaceutical product immunity, insufficiently pled, non-existent, implausible, and/or statutorily barred. Plaintiffs have filed an opposition, Dkt. No. 66 ("Opp."), and Defendant has replied, Dkt. No. 67 ("Reply").

The Court has carefully considered the arguments of the parties, both in their briefs and at oral argument. For the reasons set forth below, the Court **GRANTS** Defendant's motion to dismiss as to all causes of action based on the applicable statute of limitations **WITH LEAVE TO AMEND** to plead facts sufficient to permit application of the discovery rule and/or an equitable limitations doctrine. For the sake of efficiency, Plaintiffs may also amend their complaint to correct any other deficiencies identified by Defendant in its motion to dismiss.

United States District Court
Northern District of California

## I.     FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

This products liability action arises from the installation of Defendant's experimental CerviCore medical device in Ms. Jaeger's cervical spine (neck).  Am. Compl. ¶ 28.  Defendant portrayed implantation of the CerviCore device as preferable to fusion surgeries, which have been a common treatment for patients with degenerated or herniated cervical discs.  *Id.* ¶¶ 37, 39.

To commercialize the CerviCore device, Defendant first needed to secure approval from the Food and Drug Administration ("FDA").  Part of that approval process involves a successful human study.  *Id.* ¶ 43-45.  Defendant proposed and recruited a 400-person study: half of the subjects would receive the CerviCore device and the other half would receive fusion surgeries.  *Id.* ¶ 49.  Participants did not know which surgery they would receive before surgery occurred.  *Id.* ¶ 50.  Ms. Jaeger is one of the individuals who received a CerviCore device in this study.  *Id.* ¶ 51.

Plaintiffs' complaint focuses on the metals used to manufacture the CerviCore device that was implanted in Ms. Jaeger's neck, the quality of the manufacturing process, and the subsequent medical monitoring.  On one occasion before implantation, Defendant told Ms. Jaeger that her CerviCore device was made of "a cobalt/chrome/molybdenum alloy with a titanium coating."  *Id.* ¶ 55.  But the device apparently may have also contained nickel, a known allergen and carcinogen associated with a wide variety of toxic reactions in the human body.  *Id.* ¶¶ 41, 52-53, 56, 58.

Regardless of the particular metals used in Ms. Jaeger's CerviCore device, Defendant manufactured the device at a facility in France that did not have sufficient experience with the manufacturing methods used.  *Id.* ¶¶ 63-67.  The end result was a deficient manufacturing process that increased the risk that the CerviCore device would release metal ions and/or metal debris into the body after implantation, possibly resulting in a condition known as metallosis.  *Id.* ¶¶ 68-79.  Ms. Jaeger was one of the few patients in the study who received medical monitoring of the metal levels in her blood.  *Id.* ¶ 94.  But Defendant created no system or control for monitoring metal exposure around the implantation site as opposed to metal levels in her blood.  *Id.* ¶ 97.

Before implantation, Ms. Jaeger signed a disclosure and consent form that Defendant provided, in which Defendant promised to reimburse any medical costs in the event of a complication or injury relating to participation in the study.  *Id.* ¶¶ 136-37.  The form also

United States District Court
Northern District of California

2

provided that Defendant would inform Ms. Jaeger of any new findings, good or bad, during the course of the study. *Id.* ¶ 147.

Ms. Jaeger's CerviCore unit was implanted in May 2006 by her treating physician, Dr. James Zucherman, at the St. Mary's Medical Center in San Francisco. Am. Compl. ¶ 176. After implantation, Defendant monitored Ms. Jaeger's blood metal levels as promised, but concealed concerning results from her and her doctor for some time. *Id.* ¶¶ 103, 178-80. Defendant also did not monitor for certain alloys, like nickel, that were potentially contained in the unit. *Id.* ¶ 181. While the first years with the implant were "relatively uneventful," over the years the unit caused Ms. Jaeger increasing pain and illness. *Id.* ¶ 184. Ms. Jaeger began suffering from "debilitating" physical and psychological effects of metallosis. *Id.* ¶¶ 103, 187. On a date not specified in the complaint, Ms. Jaeger "demanded from [Defendant] . . . a copy of her metallosis test results," which Defendant provided "after much resistance." *Id.* ¶ 188. The metals test results showed elevated blood chromium levels and they also showed that [Defendant] was not testing for nickel. *Id.* ¶ 189.

Starting in 2008, a field representative for Defendant, Flor Mendoza, began pressuring Ms. Jaeger to sign additional liability waivers. *Id.* ¶¶ 190-91, 193, 195, 220. When Ms. Jaeger refused, Ms. Mendoza informed her that she would not be able to see her doctor anymore. *Id.* ¶ 194. At some point, Ms. Mendoza also tried to convince Ms. Jaeger that she was the only CerviCore recipient suffering problems, but Ms. Mendoza knew this was not true because the devices were failing at "an alarming rate" and other patients were suffering from metallosis, metal poisoning, and metal allergies. *Id.* ¶ 107. Ms. Jaeger ultimately accused Defendant of "violating the Medical Research Bill of Rights," which was part of the original disclosure and consent forms that she signed when she entered the study. *Id.* ¶ 196. By 2010, Ms. Jaeger's pain was "barely manageable" and she "intended to raise serious concerns" with her treating physician when she attended her March 2010 yearly study visit. *Id.* ¶ 192. Ms. Mendoza attended that study visit and tried to "build a case that the pain and metallosis was not due to the device failing." *Id.* ¶ 197. Sometime thereafter, Ms. Jaeger told Ms. Mendoza to stop attending her appointments. *Id.* ¶ 198.

In or around April 2012, Defendant decided to abandon the FDA approval process for the

CerviCore device due to "a number of economic factors." *Id.* ¶ 151. While Defendant told the FDA that it would continue to cover costs of medical treatment related to injuries or complications directly related to the CerviCore device, in practice Defendant told their study investigators to refuse care, potentially because Defendant told them that it would not cover the costs. *Id.* ¶¶ 160-62.

On an unspecified date in mid-2012, x-rays showed a bone mass pushing against Ms. Jaeger's esophagus, and that the device had become "loose and unstable." *Id.* ¶ 201. Dr. Zucherman, Ms. Jaeger's physician, determined that he needed to remove the CerviCore device at that time. *Id.* ¶ 202. On November 6, 2012, the device was removed from Ms. Jaeger's neck. *Id.* ¶ 202. Upon explantation, Dr. Zucherman noted that there was a "silvery fluid surrounding the implant" and sent the device and the fluid to Defendant for further testing. *Id.* ¶ 203. Defendant never contacted Ms. Jaeger to explain the "true" nature and ramifications of the fluid. *Id.* ¶ 204.

On April 11, 2014, Plaintiffs filed their original complaint as part of a mass action against Defendant in the United States District Court for the Southern District of Illinois. *See* Dkt. No. 2. Defendants answered the complaint, Dkt. No. 12, and then moved to sever the individual cases for misjoinder and transfer them to the districts where the plaintiffs resided and received their medical treatment, Dkt. No. 13. The Illinois district court granted Defendant's motion and Plaintiffs' action was transferred to this Court. Dkt. No. 30. Plaintiffs filed an amended complaint, Dkt. No. 59, and Defendant then filed the instant motion to dismiss, Dkt. No. 62.

As it pertains to this Order, Defendant's motion to dismiss contends that Plaintiffs' causes of action are time-barred. Mot. at 4-7. Plaintiffs make the threshold response that Defendant's motion to dismiss is untimely because Defendant already filed an answer to the original complaint, with the consequence that the motion should be disregarded in favor of a later summary judgment motion. Opp. at 4-6. Plaintiffs also substantively respond that their complaint is timely because their causes of action did not accrue by operation of California's discovery rule until either the date when Ms. Jaeger's physician determined the device needed to be removed or the date when the CerviCore device was actually removed. *Id.* at 6-10. And, Plaintiffs argue, even if they would normally have been put on earlier notice about Defendant's wrongdoing, Defendant fraudulently

United States District Court
Northern District of California

1   concealed Plaintiffs' causes of action by making false statements to regulators and Plaintiffs'

2   doctor.  *Id.* at 11-13.

3   **II.    LEGAL STANDARDS**

4       **A.    Federal Rule of Civil Procedure 12(b)(6)**

5       Federal Rule of Civil Procedure 12(b)(6) permits a party to move to dismiss a complaint

6   failure to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

7   dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its

8   face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible when the

9   plaintiff pleads "factual content that allows the court to draw the reasonable inference that the

10  defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

11      For the purposes of this analysis, a court "accept[s] factual allegations in the complaint as

12  true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek*

13  *v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Moreover, a court

14  "presume[s] that general allegations embrace those specific facts that are necessary to support the

15  claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994).  A court is not required,

16  however, to "assume the truth of legal conclusions merely because they are cast in the form of

17  factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam) (internal

18  quotation omitted).  "[C]onclusory allegations of law and unwarranted inferences are insufficient

19  to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

20      **B.    Federal Rule of Civil Procedure 9(b)**

21      Federal Rule of Civil Procedure 9(b) provides that, "[i]n alleging fraud or mistake, a party

22  must state with particularity the circumstances constituting fraud or mistake."  "Malice, intent,

23  knowledge and other conditions of a person's mind may be alleged generally." *Id.*  "[The Ninth

24  Circuit] has interpreted Rule 9(b) to require that allegations of fraud are specific enough to give

25  defendants notice of the particular misconduct which is alleged to constitute the fraud charged so

26  that they can defend against the charge and not just deny that they have done anything wrong."

27  *Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993) (internal citations and quotations omitted).

28      To that end, it is well-settled that claims that "sound in fraud" or those that are "grounded

in fraud" must also satisfy the heightened pleading requirements of Rule 9(b). *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (internal quotation omitted). This means that the complaint must allege "the who, what, when, where, and how" of the alleged fraudulent conduct, *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997), and "set forth an explanation as to why [a] statement or omission complained of was false and misleading," *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as recognized by Ronconi v. Larkin*, 252 F.3d 423, 429 & n.6 (9th Cir. 2001).

## III.   DISCUSSION

The Court now considers Defendant's motion to dismiss under Rule 12(b)(6) and Rule 9(b). As an initial matter, the Court finds that the motion is untimely because Defendant already answered Plaintiffs' original complaint in the Illinois district court. That said, for the sake of efficiency and given the absence of any prejudice to the parties, the Court exercises its discretion to convert the untimely motion into a timely motion for judgment on the pleadings under Rule 12(c). In that materially identical procedural posture, the Court determines that California law governs Plaintiffs' complaint and finds that Plaintiffs' causes of action must be dismissed for violation of the applicable statute of limitations. Plaintiffs are, however, granted leave to amend their complaint to cure the deficiencies noted below, if they are able to do so.

### A.   Timeliness of Defendant's Motion to Dismiss under Rule 12(b)(6)

Plaintiffs make the threshold argument that Defendant's motion to dismiss under Rule 12(b)(6) is untimely and should be disregarded in its entirety. Opp. at 6. To that effect, Rule 12(b) provides that "[a] motion asserting [the defense of failure to state a claim upon which relief can be granted] must be made before pleading if a responsive pleading is allowed." And "[t]he filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in a timely fashion prior to the amendment of the pleading[.]" 5C Fed. Prac. & Proc. Civ. § 1388 (3d ed. revised 2015); *see also Northstar Fin. Advisors Inc. v. Schwab Invs.*, — F. Supp. 3d ——, 2015 WL 5785549, at *7 (N.D. Cal. Oct. 5, 2015) (holding that a defendant may not move under Rule 12(b)(6) if it did not also do so in response to a prior

complaint).[1]

In this case, Defendant filed an answer—a responsive pleading permitted under Rule 7(a)—in response to Plaintiffs' original complaint filed in the United States District Court for the Southern District of Illinois. *See* Dkt. No. 12. Defendant did not file any Rule 12 motion before that time. Defendant did, however, move (1) to sever the mass action for misjoinder of parties under Rule 21 and (2) to transfer each severed plaintiff's action to more convenient venues. Dkt. Nos. 13-14. Those motions were granted. Dkt. No. 30. When Plaintiffs' action was transferred to this Court, the Court permitted them to amend their complaint to reflect severance and the change of venue. Dkt. No. 58. Plaintiffs did so. Defendant then filed the instant motion to dismiss.

Despite the fact that Defendant answered the original complaint instead of filing a Rule 12(b)(6) motion, it argues that its motion to dismiss is timely for two reasons. First, Defendant contends that this Court authorized it to file a Rule 12 motion in a minute scheduling order. *See* Dkt. No. 58. Specifically, Defendant points to the statement, "June 15, 2015-last day to file a response to any amended complaint," in support of its position. Defendant is incorrect. The Court did not authorize an untimely Rule 12 motion; it merely set a deadline for the filing of any response permitted by the rules. Defendant did not request, and the Court thus did not grant, any exception from the applicable rules.

Second, Defendant argues that an "amended complaint supersedes the original, the latter being treated thereafter as nonexistent." Reply at 2 (citing *Rhodes v. Robinson*, 621 F.3d 1002, 1005 (9th Cir. 2010)). By that logic, Defendant appears to argue that whenever a plaintiff files an amended complaint, a defendant is permitted to file a Rule 12(b)(6) motion in response, regardless of the procedural history. To support that position, Defendant points out that Rule 15(a)(3), which governs the time to respond to an amended pleading, refers to a "response" and not an "answer." The Court also disagrees with Defendant's argument on this point. While it is true that amended complaints supersede all prior complaints for determining the controlling allegations in an action,

---

[1] Although *Northstar* was decided in the context of successive Rule 12 motions, its logic applies equally to a situation where a defendant failed to raise any Rule 12 defenses at all. *See id.* at *6. The only exception to that rule applies when the amended pleading raises new issues. *Id.* at **6-7. But the allegations of the initial complaint and the amended complaint are materially identical.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  it does not follow that the filing of an amended complaint overrides the specific timing

2  requirements set forth in Rule 12(b).  Rule 15(a)(3) refers to the time to file a "response" because

3  it cannot predict what responses are appropriate to a particular amended pleading.  For example, a

4  plaintiff could amend a complaint before any response is filed, which would permit a defendant to

5  properly and timely file a Rule 12(b)(6) motion.  Accordingly, the Court finds that Defendant's

6  motion is untimely.

7     That said, Rule 12(h)(2) provides that the defense of "[f]ailure to state a claim upon which

8  relief can be granted . . . may be raised . . . by a motion under Rule 12(c)."  Rule 12(c) provides

9  that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for

10  judgment on the pleadings."  As a result, even if a party has failed to timely file a motion to

11  dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), it may

12  properly assert the defense under Rule 12(c) in the context of a timely motion for judgment on the

13  pleadings.  *Northstar*, 2015 WL 5785549, at *7.  Additionally, when a party files an untimely

14  motion to dismiss under Rule 12(b)(6), the Court may convert it into a motion for judgment on the

15  pleadings under Rule 12(c) where doing so will not delay trial.  *Aldabe v. Aldabe*, 616 F.2d 1089,

16  1093 (9th Cir. 1980).  "The case for [conversion into a Rule 12(c) motion] is further strengthened

17  where . . . the answer[] included the defense of failure to state a claim" because the converted

18  motion is "not based on new arguments for which [the plaintiff] could claim to have been

19  unprepared.  *Id.*

20     There is no reason to waste the resources of the parties and the Court by dismissing the

21  instant motion on procedural grounds, then waiting for Defendant to refile an identical motion

22  with a different title.  Motions for judgment on the pleadings are reviewed under an identical legal

23  standard as motions to dismiss for failure to state a claim upon which relief can be granted, so

24  there is no risk of prejudice to either party.  *See Cafasso, United States ex rel. v. Gen. Dynamics

25  C4 Sys., Inc.*, 637 F.3d 1047, 1053 (9th Cir. 2011) (on consideration of a Rule 12(c) motion, courts

26  accept facts alleged by non-movant as true in the same manner as a Rule 12(b)(6) motion).  The

27  risk of prejudice to Plaintiffs is decreased even further in this case because Defendant's answer

28  alleges the defense of "failure to state a claim upon which relief can be granted."  *See* Dkt. No. 12

at 20; *see also Aldabe*, 616 F.2d at 1093 (conversion into Rule 12(c) motion most appropriate where Rule 12(b)(6) defense is alleged in the answer).  Most importantly, trial is not scheduled to occur in this matter until September 26, 2016.  Dkt. No. 58.  Consideration of this motion under Rule 12(c) does not risk delaying the trial, which is the only stated basis to facially reject a motion for judgment on the pleadings.  Accordingly, the Court converts Defendant's untimely motion.

### B.    Choice of Law

The parties leave unsettled which state's substantive law governs Plaintiffs' causes of action.  In a footnote, Plaintiffs argue that: "[Defendant] opts not to address choice of law.  Ms. Jaeger's claim survives under California law, so [Defendant] has not carried its burden as a movant.  Were her claim to fail, though, Ms. Jaeger may be entitled to the benefit of Illinois statute of limitations law since the case was first filed there."  Opp. at 7, n.4.  Defendant responds, also in a footnote, that, "Plaintiff's [sic] choice of law note is a nonissue as California law applies" because it is the forum state and its choice-of-law rules apply.  Without applying those putative rules, Defendant notes that, "Plaintiff is a California resident who was allegedly injured in California from a California surgery."  Reply at 3, n.1.  Neither party's cursory treatment of this significant threshold issue is sufficient.  Plaintiffs' apparent belief that they may apply either California or Illinois law based on which standard benefits them is inconsistent with the basic tenets of diversity jurisdiction.  And Defendant does not consider that this is a transferred case.

To determine which state law provides the controlling substantive law, the Court must consider this diversity action's procedural history.  As noted above, Plaintiffs initially pled their causes of action as part of a mass action filed in the United States District Court for the Southern District of Illinois.  Dkt. No. 2.  Defendant then moved to sever the causes of action of each set of injured Plaintiffs for misjoinder of parties under Rule 21 and to transfer those individual actions to different venues under 28 U.S.C. § 1404(a).  The Illinois district court granted Defendant's motion to transfer Plaintiffs' case, in part because "Plaintiffs' . . . causes of action are wholly unrelated to the Southern District of Illinois."  Dkt. No. 30 at 5.  To that point, it is undisputed that Defendant is a New Jersey citizen with its principal place of business and headquarters there, Plaintiffs are California citizens, and Ms. Jaeger's surgery and other medical treatment occurred in San

9

1    Francisco.  Am. Compl. ¶¶ 22-25, 176.  The question is whether Plaintiffs' decision to file their

2    initial complaint in Illinois has any bearing on the law that this Court must apply now.

3         Part of the answer comes from the Supreme Court's seminal decision in the case of *Van*

4    *Dusen v. Barrack*.  376 U.S. 612, 629-640 (1964).  *Van Dusen* held that "where the defendants

5    seek transfer [under 28 U.S.C. § 1404(a)], the transferee district court must be obligated to apply

6    the state law that would have been applied if there had been no change of venue."  376 U.S. at

7    639; *accord Ferens v. John Deere Co.*, 494 U.S. 516 (1990).  In other words, the transferee court

8    must apply the choice-of-law rules of the transferor court's forum state.  *Ferens*, 494 U.S. at 519.

9    The principle underlying that holding is that a plaintiff, as master of her complaint, should "retain

10   whatever advantages may flow from the state laws of the forum they have initially selected."  *Van*

11   *Dusen*, 376 U.S. at 633-34.  But that notion presupposes that the initial venue was proper because,

12   otherwise, the plaintiff could reap a benefit to which she had no entitlement.  *Id.* at 633-34; 15

13   Fed. Prac. & Proc. Juris. § 3846 (4th ed. revised 2015) ("Section 1404(a) applies only when the

14   transferor court was a proper venue.").  Instead, a court may only transfer an action where venue is

15   improper under 28 U.S.C. § 1406(a).  *Van Dusen*, 376 U.S. at 634; 15 Fed. Prac. & Proc. Juris. §

16   3844 ("If venue in the district court is improper, transfer . . . must be made under . . . § 1406(a).").

17        Here, Defendant moved to transfer Plaintiffs' action to this Court under § 1404(a) instead

18   of under § 1406(a), even though the initial venue was likely improper.  *See* 28 U.S.C. § 1391

19   (venue statute).[2]  While improper venue is a waivable defect in the context of a Rule 12(b) motion

20   to dismiss, Fed. R. Civ. P. 12(h)(1), that does not necessarily mean a party can waive the proper

21   venue requirement of § 1404(a).  Nonetheless, at Defendant's request, and without addressing the

22   issue, the Illinois district court apparently transferred this action to this Court under § 1404(a).

23

24   _____

     [2] Section 1391(b) provides: "A civil action may be brought in--(1) a judicial district in which any
25   defendant resides, if all defendants are residents of the State in which the district is located; (2) a
     judicial district in which a substantial part of the events or omissions giving rise to the claim
26   occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there
     is no district in which an action may otherwise be brought as provided in this section, any judicial
27   district in which any defendant is subject to the court's personal jurisdiction with respect to such
     action."  It is undisputed that Defendant did not reside in the Southern District of Illinois and that
28   no event or omission giving rise to Plaintiffs' causes of action occurred there.  There is also no
     dispute that venue is proper in this Court, negating the possible applicability of subsection (3).

United States District Court
Northern District of California

The question now presented is whether the Illinois district court's decision to transfer under § 1404(a) necessarily brought Illinois's choice-of-law rules to this Court, as it would under *Van Dusen* if the Southern District of Illinois was a proper venue. Importantly, if the action had been transferred under § 1406(a), "the holding in *Van Dusen* . . . should not apply." 15 Fed. Prac. & Proc. § 3846.

It also appears that the Illinois district court lacked personal jurisdiction over Defendant. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980) ("[A] state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist minimum contacts' between the defendant and the forum State."). Like improper venue, lack of personal jurisdiction is a waivable defect in the context of Rule 12(b), Fed. R. Civ. P. 12(h)(1), and most courts agree that lack of personal jurisdiction does make transfer under § 1404(a) impermissible, 15 Fed. Prac. & Proc. § 3844. But "where the transferor court lacked personal jurisdiction, the transferee court must apply its own law regardless whether the transfer purports to rest on Section 1406(a) or Section 1404(a)." 14D Fed. Prac. & Proc. Juris. § 3827; *see also Nelson v. Int'l Paint Co.*, 716 F.2d 640, 643-44 (9th Cir. 1983) (in "cases transferred under § 1404(a) or 1406(a) to cure a lack of personal jurisdiction in the district where the case was first brought . . . courts should look to the law of the transferee state . . . to prevent forum shopping, and to deny plaintiffs choice-of-law advantages to which they would not have been entitled in the proper forum").

As an initial matter, the Court notes that it does not purport to review the basis for the transferor court's transfer order under § 1404(a). The Ninth Circuit has held that it lacks appellate jurisdiction to review an out-of-circuit transferor court's order to a transferee court within this circuit on appeal. *Posnanski v. Gibney*, 421 F.3d 977, 980 (9th Cir. 2005). It would seem to follow that a transferee court within this circuit would similarly lack jurisdiction to review a transfer order. To that effect, *Posnanski* favorably quoted an *en banc* decision of the D.C. Circuit which held, "[i]t is well-established that a transferee court cannot directly review the transfer order [from an out-of-circuit district court] itself." *Id.* (quoting *Starnes v. McGuire*, 512 F.2d 918, 924 (D.C. Cir. 1974) (en banc)).

For that reason, this Court does not "review" the basis of the transfer under § 1404(a), even

United States District Court
Northern District of California

though it appears that the initial venue was likely improper.[3]  It does not need to do so to conclude that *Van Dusen* does not apply because the initial forum lacked personal jurisdiction over Defendant.  While a transferor court need not have personal jurisdiction to transfer an action under § 1404(a), 15 Fed. Prac. & Proc. Juris. § 3844, lack of personal jurisdiction precludes application of *Van Dusen* in the transferee court, *id.* § 3827.  Plaintiffs argued in opposition to the transfer motion that Defendant waived a personal jurisdiction defense, Dkt. No. 22 at 4, but Defendant preserved the defense by alleging it as an affirmative defense in its initial answer, Dkt. No. 12 at 23.  *See* Fed. R. Civ. P. 12(h)(2) ("A party waives [the defense of lack of personal jurisdiction] by . . . failing to either make it by motion under this rule or include it in a responsive pleading[.]") Accordingly, the Court may consider in the first instance whether personal jurisdiction existed.

The Court finds that, on the face of both the original and amended complaints, the initial forum state did not have personal jurisdiction over Defendant.  It is undisputed that Defendant is a New Jersey citizen with both its principal place of business and headquarters located there.  Am. Compl. ¶¶ 24-25.  It is also undisputed that the alleged conduct from which Plaintiffs' causes of action arise occurred entirely in California.  *Id.* ¶¶ 176-211.  For those reasons, the Illinois district court found in its transfer order that "Plaintiffs' . . . causes of action are wholly unrelated to the Southern District of Illinois."  Dkt. No. 30 at 5.  Plaintiffs do not allege that Defendant had any connection to Illinois, and the Illinois district court made an explicit finding that there was no connection.  Because Plaintiffs allege no actions by Defendant that occurred in or were directed to Illinois, the Court concludes that Plaintiffs' claim necessarily could not have "arise[n] out of or relate[d] to the defendant's forum-related activities" so as to support personal jurisdiction there. *See Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012); *see also Facebook, Inc. v. Teachbook.com, LLC*, No. CV 10-3654, 2011 WL 1672464, at **2-3 (N.D. Cal.

---

[3] In any event, it is not clear that the transferor court erred in any way.  In a materially identical case, the transferor court found that the parties waived a probable venue defect regarding the application of § 1404(a) by failing to raise the issue during briefing.  *See Spaeth v. Michigan State University College of Law*, 845 F. Supp. 2d 48, 57 & n.14 (D.D.C. 2012).  Plaintiffs not only failed to challenge the transfer motion on that basis, but argued to the Illinois district court that Defendant's requested use of § 1404(a) indicated venue was proper.  Dkt. No. 22 at 4, n.1 ("By its choice of venue transfer statute 28 U.S.C. § 1404(a) (and not § 1406(a)), [Defendant] indicates venue is proper in this district.") (citing *Van Dusen*)).

1    May 3, 2011) (granting motion to dismiss for lack of personal jurisdiction based solely on the

2    allegations of the complaint).  On that basis, the Court finds that Illinois never had personal

3    jurisdiction over Defendant.  The Court therefore applies California choice-of-law rules to

4    determine which law applies in this case.

5          California applies a three-step governmental interest test to determine choice of law: (1)

6    "the court examines the substantive laws of each jurisdiction to determine whether the laws differ

7    as applied to the relevant transaction," (2) "if the laws do differ, the court must determine whether

8    a true conflict exists in that each of the relevant jurisdictions has an interest in having its law

9    applied," and (3) "if more than one jurisdiction has a legitimate interest . . . the court [must]

10   identify and apply the law of the state whose interest would be more impaired if its law were not

11   applied." *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001).

12         Assuming for the sake of argument that there is in fact a difference between California and

13   Illinois law regarding Plaintiffs' causes of action, it is clear that Illinois would have no interest in

14   having its law applied in this case.  *See Ins. Co. of N. Am. v. Fed. Exp. Corp.*, 189 F.3d 914, 921

15   (9th Cir. 1999) (court may presume conflict of law when considering whether there is a conflict of

16   governmental interests).  This case has no connection to Illinois whatsoever.  Am. Compl. ¶¶ 22-

17   25; 176-211.  The Court therefore applies California law.  *See Ins. Co. of N. Am.*, 189 F.3d at 921

18   (other state has no legitimate interest where a California citizen suffered harm in California as a

19   result of wrongdoing that did not occur in the other forum).

20         Finally, before turning to the statute of limitations issue that lies at the heart of this motion

21   to dismiss, the Court briefly addresses the manner in which Plaintiffs pled their causes of action.

22   The amended complaint lists various causes of action without reference to the substantive law that

23   underlies them and then includes a "cause of action" entitled "California Statutory and Common

24   Law Remedies," into which all previously allegations are incorporated by reference.  Am. Compl.

25   ¶ 326.  Plaintiffs assert that they "plead violations of California state statutory and common law

26   remedies where California has adopted state statutory or common law remedies to replace the

27   common law theories espoused in [the other causes of action]."  *Id.* ¶ 327.

28         For the reasons described above in the Court's choice-of-law analysis, all of Plaintiffs'

United States District Court
Northern District of California

13

1  causes of action are governed by California law.  Any suggestion that there is a federal general

2  "common law" that controls actions in diversity until "replaced" by state law is incorrect.  *See*

3  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal

4  Constitution or by acts of Congress, the law to be applied in any case is the law of the state.  And

5  whether the law of the state shall be declared by its Legislature in a statute or by its highest court

6  in a decision is not a matter of federal concern.  There is no federal general common law.").  All of

7  Plaintiffs' causes of action must flow from state law in this diversity action, and that state law

8  comes from California.  Accordingly, the Court disregards Plaintiffs' "cause of action" that

9  purports to incorporate California law as redundant of the causes of action already alleged.  Upon

10  amendment, if any, Plaintiffs are directed to plead their causes of action under California law.

**C.      Statute of Limitations**

12      Having set the procedural and substantive stage for Defendant's motion, the Court now

13  turns to Defendant's statute of limitations argument.  The Court first identifies the controlling

14  statute of limitations for Plaintiffs' causes of action, then determines when Plaintiffs' causes of

15  action accrued as alleged, and finally considers whether the limitations period is subject to

16  equitable estoppel or tolling.  The Court concludes that Plaintiffs' causes of action are time-barred

17  as pled.

1.      <u>Personal Injury Statute of Limitations</u>

19      California Code of Civil Procedure § 335.1 provides a two-year limitations period for any

20  "action for . . . injury to . . . an individual caused by the wrongful act or neglect of another."  That

21  limitations period applies to any "personal injury claims based on defective products regardless of

22  the particular legal theory invoked."  *See Soliman v. Philip Morris Inc.*, 311 F.3d 966, 971 (9th

23  Cir. 2002); *Rubino v. Utah Canning Co.*, 123 Cal. App. 2d 18, 26 (1954) ("[T]he legislative intent

24  behind [§ 335.1] was not to restrict its coverage to tort actions independent of any contractual

25  relation, but to provide a limitation . . . where personal injury or death results, regardless of the

26  tort, contract or breach of express or implied warranty aspect of the case.").[4]

27  ───────────────

28  [4] Although *Soliman* and *Rubino* both reference a one-year limitations period for personal injury actions, the California legislature amended its Code of Civil Procedure in 2002 to create § 335.1,

14

2.     The Discovery Rule

"A plaintiff must bring a claim within the limitations period after accrual of the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005) (citing Cal. Code Civ. P. § 312). "Generally speaking, a cause of action accrues at the time when the cause of action is complete with all of its elements." *Id.* Those elements include: wrongdoing, harm, and causation. *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1191 (2013). This is the "last element" accrual rule. *Id.* "For both negligence and strict products liability claims, the last element to occur is generally, as a practical matter, the injury to the future plaintiff." *Fox*, 35 Cal. 4th at 806.

"An important exception to the general rule of accrual is the discovery rule, which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Id.* (internal quotation omitted). "A plaintiff has reason to discovery a cause of action when he or she has reason to suspect a factual basis for its elements." *Id.*; *see also Gutierrez v. Mofid*, 39 Cal. 3d 892, 897 (1992) ("[T]he uniform California rule is that a limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the *facts* essential to his claim[.]"). "Under the discovery rule, suspicion of one of more of the elements of a cause of action, coupled with knowledge of any remaining elements, will generally trigger the statute of limitations period." *Fox*, 35 Cal. 4th at 807. "[A] plaintiff's suspicion of elements of a cause of action [refers] to the generic elements of wrongdoing, causation, and harm." *Id.* (internal quotations omitted). California courts do not take a "hypertechnical approach to the application of the discovery rule," but instead "look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." *Id.*

A defendant asserting a limitations defense bears the burden of proving that the action is time-barred. *Kaiser Found. Hosps. v. Workers' Comp. Appeals Bd. (Martin)*, 39 Cal. 3d 57, 67 (1985); *see also Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995) (state law allocates the burden of proof). But "[a] plaintiff whose complaint shows on its face that his claim

---

which now governs personal injury actions and provides for a two-year limitations period. *See* 2002 Cal. Stats. ch. 448 (S.B. No. 688), § 3; *see also Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 809, n.3 (2005) (discussing change in limitations period under § 335.1).

15

would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808.  That said, courts must assume to be true any specific allegations explaining that the plaintiff "did not discover, nor suspect, nor was there any means through which her reasonable diligence would have revealed, or through which she would have suspected [the defendant's action] as a cause of her injury," at the dismissal stage. *Id.* at 811.

### 3.   Fraudulent Concealment

"A close cousin of the discovery rule is the well accepted principle of . . . fraudulent concealment." *Bernson v. Browning-Ferris Indus. of Cal., Inc.*, 7 Cal. 4th 926, 931 (1994) (internal quotation omitted).  "It has long been established that the defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it." *Id.*  (internal quotation omitted).  "Like the discovery rule, the rule of fraudulent concealment is an equitable principle designed to effect substantial justice between the parties; its rationale is that the culpable defendant should be estopped from profiting by his own wrong to the extent that it hindered an otherwise diligent plaintiff in discovering his cause of action." *Id.* (internal quotation omitted).

Under California law, a plaintiff asserting fraudulent concealment as an equitable estoppel on the statute of limitations must plead that: "(1) the party to be estopped [was] apprised of the facts; (2) that party must [have] intend[ed] that his or her conduct be acted on, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the party asserting the estoppel must [have been] ignorant of the true state of facts; and (4) the party asserting the estoppel must [have] reasonably rel[ied] on the conduct to his or her injury." *Lukovsky v. City and Cnty. of San Francisco*, 535 F.3d 1044, 1051-52 (9th Cir. 2008) (citing *Honig v. San Francisco Planning Dept.*, 127 Cal. App. 4th 520, 529 (2005)).  The factual basis for fraudulent concealment must differ from any cause of action for fraud that is pled. *Id.* ("[T]he plaintiff must point to some fraudulent concealment, some active conduct by the defendant "above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time.").  And, in a

federal diversity action, a plaintiff alleging fraudulent concealment must satisfy the heightened

pleading requirements of Rule 9(b). *389 Orange Street Partners v. Arnold*, 179 F.3d 656, 662 (9th

Cir. 1999); *see also Cooper*, 137 F.3d at 627 (Rule 9(b) pleading requirements).

4.    <u>Analysis</u>

Because each of Plaintiffs' causes of action is based on Ms. Jaeger's personal injury, even

Mr. Jaeger's derivative cause of action for loss of consortium, the Court finds that the two-year

personal injury statute of limitations controls. *See Clark v. Baxter Healthcare Corp.*, 83 Cal. App.

4th 1048, 1054, n.2 (2000) (personal injury statute of limitations applies to fraud, product liability,

and negligence causes of action based on personal injury); *Cardoso v. Am. Med. Sys., Inc.*, 183

Cal. App. 3d 994, 999-1000 (1986) (same for express and implied breach of warranty); *Eidson*, 40

F. Supp. 3d at 1210, 1217 (same for cause of action for loss of consortium); *McDowell v. Union*

*Mut. Life Ins. Co.*, 404 F. Supp. 136, 147-48 (C.D. Cal. 1975) (same for intentional infliction of

emotional distress); *see also Rubino*, 123 Cal. App. 2d at 26 (same for contract claims).[5]

Taking all facts properly pled as true and drawing all reasonable inferences in Plaintiffs'

favor, the Court must now determine as a matter of law when Plaintiffs' causes of action accrued

and whether accrual was subsequently tolled by Defendant's alleged fraudulent concealment.

Defendant contends Plaintiffs' allegation that Ms. Jaeger had "throbbing, shooting, intense, and

radiating" pain that prevented her from performing normal daily activities, which became "barely

manageable" to the point that she had "serious concerns" in 2010, shows that Plaintiffs' causes of

action accrued more than two years before Plaintiffs filed suit on April 11, 2014. Mot. at 4-5; Am.

Compl. ¶¶ 184-85, 197, 192, 200-01. Even if Ms. Jaeger's pain alone was insufficient to accrue

Plaintiffs' causes of action, Defendant points to Plaintiffs' allegation that Ms. Jaeger "demanded"

and received her blood-metal test results, which indicated both elevated chromium levels and that

---

[5] In some contexts, California law may permit breach of contract actions based on personal injury to apply the contractual statute of limitations. *See McDowell*, 404 F. Supp. at 143-45 (contract claims resulting in personal injury are subject to the contractual statute of limitations depending on whether "the tort character of the action is considered [not] to prevail"); 3 Witkin, Cal. Proc. (Actions) § 565 (5th ed. 2008) ("This insistence on the tort statute of limitations in actions based on breach of contract is at variance with the theory of later cases that other procedural or substantive advantages may be gained from an election of the contract remedy."). In any case, the Court finds that the tort nature of Plaintiffs' breach of contract causes of action plainly prevails.

United States District Court
Northern District of California

Defendant was not testing for the presence of nickel.  Mot. at 5; Am. Compl. ¶¶ 188-89.  And, in any case, Defendant contends that Plaintiffs did not plead specific facts alleging when or how Ms. Jaeger discovered her causes of action or that she was unable to do so earlier despite reasonable diligence, as required by California law to invoke the discovery rule.  Mot. at 6-7.  Defendant similarly argues that Plaintiffs failed to properly plead any kind of fraudulent concealment.  *Id.*

Plaintiffs respond that their causes of action could not have accrued when Ms. Jaeger began feeling pain because even her treating physician, Dr. Zucherman, did not know the device was harming her until he took x-rays in mid-2012 and determined he need to operate to remove the CerviCore device.  Opp. at 7; Am. Compl. ¶ 199-200.  Plaintiffs also contend that Ms. Jaeger had no prior notice of wrongdoing with respect to the CerviCore device because Defendant's sales representative, Ms. Mendoza, attended her medical appointments and promised to provide her with information about the progress of the human trial, but none was ever delivered.  Opp. at 8-9; Am. Compl. ¶¶ 107, 125-28, 134-35, 136-46, 147-61.  According to Plaintiffs, these statements and omissions, in connection with false statements made to regulators and doctors, served to fraudulently conceal the bases for their causes of action well beyond the limitations period's normal range.  Opp. at 11-12.

Defendants reply that even if Plaintiffs have established that they did not have actual notice of their causes of action before the limitations period began as a matter of law, they certainly had inquiry notice regardless of any representations made by Ms. Mendoza.  Reply at 3-4.  The fact that Dr. Zucherman did not recommend explantation at an earlier date, Defendant argues, does not mean that Plaintiffs did not have a duty to conduct a reasonable investigation.  *Id.* at 4-5.  Finally, Defendant contends that it is unclear what effect allegedly false statements made to regulators had on Ms. Jaeger's understanding of her causes of action and, in any case, none of those allegations about deceptive statements to the FDA are contained in the amended complaint.  *Id.* at 5-6.

The Court finds that, without the operation of the discovery rule, all of Plaintiffs' causes of action (except those for breach of contract) accrued as soon as Ms. Jaeger incurred an injury as a result of the defective nature of the implanted CerviCore device.  *See Fox*, 35 Cal. 4th at 806 (cause of action normally accrues when complete with all of its elements, which, in the products

United States District Court
Northern District of California

liability context, is usually injury); *see also Aryeh*, 55 Cal. 4th at 1191 (last element accrual rule). Injury to Ms. Jaeger occurred in 2008 at the latest. *See* Am. Compl. ¶¶ 184-87, 191 ("In 2008 . . . Ms. Jaeger's pain was increasing."). That occurred outside the two-year limitations window. *See* Am. Compl. (filed April 11, 2014).

Plaintiffs' claim that accrual occurred, even without delayed discovery, when Dr. Zucherman recommended explantation cannot be correct. The case they cite for support, *Nodine v. Shiley Inc.*, holds precisely to the contrary of their position. *See* 240 F.3d 1149, 1153 (9th Cir. 2001). In that case, the Ninth Circuit explained that, under California law, "where an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not material that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date." *Id.* (quoting *Spellis v. Lawn*, 200 Cal. App. 3d 1075, 1080-81 (1988)). For that reason, the court held that although the plaintiff incurred further injury from explantation of her medical device, her claims were still time-barred because she had incurred an injury much earlier. *Id.* That is the same situation presented here. Accordingly, all of these non-breach-of-contract causes of action are facially time-barred.

Although Plaintiffs fail to distinguish between their tort and breach-of-contract causes of action with respect to their time of accrual, the analytical distinction between them is plain and the Court addresses the issue for the sake of accuracy. Unlike Plaintiffs' other causes of action, their causes of action for breach of contract did not accrue when Ms. Jaeger was injured. Instead, they accrued when damage flowed to Ms. Jaeger from Defendant's breach. *See Walsh v. W. Valley Mission Cmty. Coll. Dist.*, 66 Cal. App. 4th 1532, 1545 (1998) ("To be entitled to damages for breach of contract, a plaintiff must plead and prove (1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff."). Plaintiffs allege two different causes of action for breach of contract. The first is that Defendant failed to provide promised medical care to Ms. Jaeger; the second is that Defendant failed to provide promised new information about the progress of the CerviCore study to Ms. Jaeger. Am. Compl. ¶¶ 292-301.

1    With respect to Defendant's alleged breach of contract for failure to provide medical care,

2    Plaintiffs argue elsewhere in their opposition that breach occurred when Ms. Mendoza "presented

3    [Ms. Jaeger] with more forms to sign" and "threatened to cut her off from her doctor" during her

4    course of treatment.  Opp. at 22; Am. Compl. ¶¶ 189-96.  As alleged, those incidents occurred

5    before Ms. Jaeger's annual study visit with Dr. Zucherman in 2010.  *See* Am. Compl. ¶ 193 ("Ms.

6    Mendoza contacted her prior to the [2010] visit and demanded she sign yet another addendum to

7    the study agreement."), ¶ 194 ("When Ms. Jaeger refused, Ms. Mendoza informed her she would

8    not be able to see Dr. Zucherman.").  Accordingly, under that theory of breach, Plaintiffs' breach

9    of contract cause of action for failure to provide medical care is not only facially time-barred, but

10   seemingly impossible to save by operation of the discovery rule or equitable tolling.  That said, the

11   Court grants Plaintiffs leave to amend their complaint in the event they can identify a later breach.

12   With respect to Defendant's alleged breach of contract for failure to provide Ms. Jaeger

13   with new information about the progress of the CerviCore study, Plaintiffs allege that Defendant

14   failed to provide a single safety update during the course of the study.  Am. Compl. ¶¶ 148-50.

15   But Plaintiffs allege that Defendant terminated the study "in or around April 2012."  *Id.* ¶ 151.  If

16   the breach could only have occurred "[d]uring the course of the study," *id.* ¶ 147, and the study

17   ended more than two years before Plaintiffs filed their original complaint, any breach must have

18   occurred outside of the limitations period.  Accordingly, Plaintiffs' cause of action for failure to

19   provide new information is facially time-barred.  Unlike Plaintiffs' other contract cause of action,

20   however, it is possible that Plaintiffs did not have any knowledge of information that Defendant

21   withheld from them during the time breach could have occurred.  For that reason, the Court will

22   consider whether the discovery rule delayed accrual or whether equitable tolling is warranted.

23   Turning now to the discovery rule, the California Supreme Court has explained that in the

24   context of products liability actions, "a plaintiff's ignorance of wrongdoing involving a product's

25   defect will usually delay accrual because such wrongdoing is essential to that cause of action."

26   *Fox*, 35 Cal. 4th at 813.  For the period of time after the CerviCore device was implanted during

27   which Ms. Jaeger experienced pain and illness, Plaintiffs were plainly on notice of Ms. Jaeger's

28   injury, *see* Am. Compl. ¶¶ 103, 187, but they were not on notice of her injury's allegedly wrongful

United States District Court
Northern District of California

20

United States District Court
Northern District of California

1    cause as a matter of law.  *See Unijan v. Berman*, 208 Cal. App. 3d 881, 885 (1989) ("Where, as

2    here, the injury is obvious but there is nothing to connect that injury to defendant's negligence it

3    cannot be said as a matter of law the plaintiff's failure to make an earlier discovery of fault was

4    unreasonable.").  Ms. Jaeger underwent an experimental surgery and a reasonable person might

5    expect serious pain or non-wrongful complications to flow from the surgery.  *See Rhynes v.*

6    *Stryker Corp.*, No. 10-5619, 2011 WL 5117168, at *3 (N.D. Cal. Oct. 27, 2011) (applying

7    California law to hold that a plaintiff's experience of "intense physical pain" following the

8    implantation of a medical device does not mean that the plaintiff "could have reasonably suspected

9    that her pain was due to a defect in the device"); *see also Kitzig v. Nordquist*, 81 Cal. App. 4th

10   1384, 1392 (2000) ("The mere fact that an operation does not produce hoped-for results does not

11   signify negligence and will not cause commencement of the statutory period.").

12        But the Court is hard-pressed to imagine how Plaintiffs were not placed on *at least* inquiry

13   notice about CerviCore's wrongful defects when Ms. Jaeger "demanded" to see her blood-metal

14   test results (because she had been experiencing symptoms consistent with metallosis) and saw that

15   her blood contained elevated levels of chromium.  *See Am. Compl. ¶¶ 187-89.  Ms. Jaeger knew

16   the entire time she was a participant in the CerviCore study that Defendant was testing her blood

17   to determine if the device was improperly releasing metal ions and/or debris into her body.  *See id.*

18   *¶¶ 94, 178.  When Ms. Jaeger found out that her blood contained elevated levels of a metal she

19   was told was used to manufacture the CerviCore device, *id.* ¶ 55, that knowledge confirmed the

20   CerviCore device was defective in precisely the manner Defendant's monitoring was looking for.

21   The fact that Defendant then actively resisted providing the test results and kept pressuring her to

22   sign additional liability waivers and addenda regarding explantation should have only added to

23   Plaintiffs' suspicion.  In fact, Plaintiffs seem to confirm that Ms. Jaeger was on inquiry notice

24   about the device by pleading that explantation "confirmed Ms. Jaeger's fear: she had been the

25   victim of metallosis." *Id.* ¶ 103(f).  On the facts alleged, it would be unreasonable not to infer that

26   Ms. Jaeger's fear about metallosis arose when she received her blood-metal test results.

27        None of the authorities cited compel a different conclusion.  In *Rhynes v. Stryker Corp.*, a

28   court in this district applied California's discovery rule to consider whether a plaintiff who had a

21

medical device implanted in her hip was placed on notice of the product's allegedly defective nature outside of the limitations period.  2011 WL 5117168, at **1-2.  After implantation, the plaintiff began to suffer from "intense physical pain," but there were no facts to suggest that she could have suspected her pain was due to a defect in the device.  *Id.* at *3.  The plaintiff only came to know that the implant was defective when it was explanted and examined.  *Id.* at *2.  Based on the allegations in the complaint, the court held that there was nothing to suggest to the plaintiff that she had a cause of action against the defendant medical-device manufacturer until explantation.  *Id.* at *3.  That is simply not the case here.  Before explantation, Plaintiffs had actual knowledge of medical tests that showed the CerviCore device was likely causing metallosis.

Similarly, in *Eidson v. Medtronic, Inc.*, 40 F. Supp. 3d 1202 (N.D. Cal. 2014) ("*Eidson II*"), another court in this district applied California's discovery rule to consider whether a plaintiff who had a medical device implanted to stimulate bone growth after a spinal fusion surgery timely filed a products liability action.  The plaintiff's doctor, without telling the plaintiff, had used the device in an off-label manner that was recommended by the defendant device-manufacturer.  *Id.* at 1210.  After the implant started causing him pain, the plaintiff complained to his doctor, who told him that the pain was due to a "biological phenomenon."  *Id.*  The plaintiff ultimately underwent corrective surgery.  *Id.*  Although the plaintiff filed suit six years after his injury, the plaintiff did not know that the particular medical device causing his pain was even used in his surgery.  *Id.*  He pled that he only found about the use of the device when his mother saw a commercial about off-label use of the device in surgeries like his and told him to inquire further.  *Id.* at 1217.  The court held that the plaintiff was not on inquiry notice before that time because his doctor never told him the device was used and even reassured him that the source of his injury was "biological."  *Id.* at 1219.  In the present case, Ms. Jaeger knew the CerviCore device was used and does not allege that her doctor told her that her pain and illness was caused by something other than the device.

For these reasons, the Court finds, based on the allegations currently pled, that Plaintiffs were on inquiry notice about their non-breach-of-contract causes of action when Ms. Jaeger received her blood-metal test results.  Yet Plaintiffs' complaint neither alleges the date on which Ms. Jaeger demanded her blood test results, nor the date on which she actually received and

reviewed her results.  Plaintiffs also fail to plead facts supporting their conclusory claim that they conducted a reasonably diligent investigation.  Plaintiffs merely allege that, "[d]espite diligent investigation . . . Plaintiffs did not know the cause of their injuries, the nature of the defective product, or the tortious nature of [Defendant's] wrongdoing until a date within the applicable statute of limitations for filing Plaintiffs' claims."  Am. Compl. ¶ 224; *see also id.* ¶ 223. Plaintiffs similarly fail to plead facts to support application of the discovery rule to their breach of contract causes of action.  These pleading deficiencies are fatal in the context of the discovery rule. *See Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 893-94 (N.D. Cal. 2013) ("*Eidson I*").

The only question remaining is whether Plaintiffs can benefit from the equitable estoppel doctrine of fraudulent concealment.  In that respect, whether Plaintiffs were otherwise on inquiry notice for the purpose of the discovery rule does not necessarily bar application of the fraudulent concealment doctrine.  If Plaintiffs had alleged that they reasonably relied on actions taken by Defendant to conceal its wrongdoing even upon diligent inquiry, then that would equitably estop Defendant from asserting Plaintiffs' claims are time-barred at the pleading stage.  *See Lukovsky*, 535 F.3d at 1051-52.  But Plaintiffs merely allege generically that Defendant "actively concealed information and actively misled Ms. Jaeger, her doctors, and other study participants regarding CerviCore's dangers, the study's noncompliance, [and] the cause and nature of Ms. Jaeger's injuries" because it "refused . . . to provide [] testing and medical care . . . [or] true and accurate information about their CerviCore units' metal content" and used relationships with study physicians to "sharply control Ms. Jaeger's [] access to information about [her] health."  *Id.* ¶¶ 217-19, 225.

Those allegations are insufficient to invoke fraudulent concealment.  As an initial matter, the factual basis for fraudulent concealment must differ from any cause of action for fraud that is pled.  *Lukovsky*, 535 F.3d at 1051-52.  Plaintiffs' allegation regarding Defendant's failure to provide true or accurate information about the CerviCore units' metal content merely parallels their fraud causes of action.  *See* Am. Compl. ¶¶ 277-86.  Plaintiffs' remaining allegations of fraudulent concealment—that Defendant failed to provide testing and medical care or truthful information—are also insufficient.  Plaintiffs do not plead how those omissions could actively

23

conceal wrongdoing.  Fraudulent concealment does not exist merely because a defendant does not tell a plaintiff about its causes of action.  And, in any case, Plaintiffs' generalized allegation that Defendant "actively conceal[ed]" their causes of action does not satisfy the heightened pleading requirements of Rule 9(b).  *See 389 Orange Street Partners v. Arnold*, 179 F.3d at 662.  For those reasons, the Court finds that Plaintiffs have not adequately alleged fraudulent concealment to equitably estop Defendant from asserting the statute of limitations at the pleading stage.

## IV.    CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Defendant's motion to dismiss as to all causes of action based on the applicable statute of limitations **WITH LEAVE TO AMEND** to plead facts sufficient to permit application of the discovery rule and/or an equitable limitations doctrine.  For the sake of efficiency, Plaintiffs may also amend their complaint to correct any other deficiencies identified by Defendant in its motion to dismiss.  Any amended complaint must be filed within 28 days of the date of this Order.

**IT IS SO ORDERED.**

Dated:  February 10, 2016

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California